DICK'S CLOTHING & SPORTING GOODS, INC., Appellant,

v.

PHAR–MOR, INC., et al., Appellees.

No. 4:95–CV–1115.

United States District Court, N.D. Ohio, Eastern Division.

July 15, 1997.

John Silas Hopkins, III, Matthew R. Goldman, Baker & Hostetler, Mark R. Koberna, Cleveland, OH, for appellant.

Charles C. Wolf, O'Melveny & Myers, Los Angeles, CA, Michael A. Gallo, Jr., Nadler, Nadler & Burdman, Youngstown, OH, for appellee Phar–Mor, Inc.

Joyce A. Kuhns, Weinberg & Green, Baltimore, MD, for appellees Handel Development Corp. and Ole Partnership.

Anthony J. O'Malley, Vorys, Sater, Seymour & Pease, Cleveland, OH, Frederick R. Reed, Vorys, Sater, Seymour & Pease, Cincinnati, OH, for appellee Kohl's Department Stores, Inc.

### *MEMORANDUM OPINION AND ORDER*

DONALD C. NUGENT, District Judge.

This matter comes before the Court on appeal from a decision of the United States Bankruptcy Court for the Northern District of Ohio. *See* 28 U.S.C. § 158(a)(1). Appellant Dick's Clothing & Sporting Goods, Inc. ("Dick's") challenges the Bankruptcy Court's order confirming the sale of certain property owned by Appellee Phar–Mor, Inc. ("Phar–Mor"), the debtor in the bankruptcy proceedings, to Appellee Handel Development Corp. ("HDC") instead of Dick's, and the Bankruptcy Court's subsequent orders denying Dick's motion to amend the confirmation or-

der and for a stay of the order. Appellees HDC and OLE Partnership ("OLE"), an assignee of HDC, moved to dismiss the appeal on standing and mootness grounds.

For the reasons stated herein, the decisions of the Bankruptcy Court are **AFFIRMED** and the Motion to Dismiss is **DENIED**.

### FACTS AND PROCEDURAL HISTORY

After filing for Chapter 11 relief in August 1992, Phar–Mor made several attempts to sell certain property it owned in a shopping center in Boardman, Ohio, known as the Shops at Boardman Park. In August 1994, pursuant to 11 U.S.C. § 363, Phar–Mor filed with the Bankruptcy Court a motion to sell the property to HDC for $4.1 million. Bankruptcy Court Document # 5291. Prior to the hearing on Phar–Mor's motion, Dick's filed an objection to the motion, stating that it was willing to pay more for the property. Bankruptcy Court Document # 5359.

The Bankruptcy Court adjourned the hearing on Phar–Mor's motion so that Phar–Mor could conduct an auction. Bankruptcy Court Order dated April 17, 1995 at 2, Bankruptcy Court Document # 7163 (hereinafter "April 17 Order"). The auction was held on September 26, 1994, during which Phar–Mor met with representatives of Dick's, HDC and Kohl's Department Stores, Inc. ("Kohl's"), both individually and jointly. *Id.* at 2–3. The bidding process had two categories of bidding. *Id.* at 3. The first category consisted of bids for the property subject to three development agreements regarding development of the property and easements and covenants pertaining to common areas and the entire shopping center, to which Phar–Mor and the Developer of the property, Monus–Handel Partnership No. 1 [1], were parties. *See id.* at 2–3. The three agreements are a Joint Development Agreement ("JDA"), an Amended and Restated Reciprocal Easement and Operating Agreement ("REA"), and a Memorandum of Understanding ("MOU") (hereinafter collectively the "Agreements"). *Id.* at 2. The second category of the bidding

process consisted of bids for the property free and clear of the Agreements. *Id.* at 3. HDC offered to pay $6.2 million for the property and to withdraw a claim against Phar–Mor estimated to be worth over $100,000. *Id.* Its bid was subject to the Agreements. *Id.* HDC did not participate in the second category of bidding because it was an affiliate of the Developer (controlled by David Handel, sole shareholder of HDC) and it did not want to damage its or the Developer's interest in the Agreements or the property. *Id.* Dick's submitted a $6.3 million bid in both categories. *Id.* Kohl's did not match the bids in the first category and did not participate in the second category. *Id.*

Phar–Mor decided to accept Dick's bid and moved to amend its August 1994 motion to sell the property. April 17 Order at 3; *See* Bankruptcy Court Document # 5511. HDC objected to the motion. April 17 Order at 3; Bankruptcy Court Document # 5393, # 5409. HDC stated that it would be willing to make a higher offer. April 17 Order at 3.

At the October 13, 1994 hearing on Phar–Mor's motion to sell the property to Dick's, the Bankruptcy Court reiterated its belief that any sale of the property should be subject to the Agreements and that any dispute over their applicability or interpretation should be resolved in state court. Transcript of October 13, 1994 Hearing at 8–9, 15–17, 19, Bankruptcy Court Document # 5657 (hereinafter "Oct. 13 Hrg. Tr."). In the Bankruptcy Court's words,

> [I]t was my intention that [the sale] would be subject to the reciprocal easement agreement, the joint development agreement, and the memorandum of understanding. I had no intention in the sale process of upsetting the orderly development of these properties by providing an opportunity for the sale to be with the rejection somehow of those agreements.
>
> \*    \*    \*    \*    \*    \*
>
> If those agreements have any defects in them, of any sort, it seems to me that is subject to applicable state law and the

---

**1.** The Developer is now known as The Shops at Boardman Park Partnership No. 1. April 17 Order at 3.

appropriate forum to contest those, if at all, is in a state court forum.

Oct. 13 Rrg. Tr. at 4–5, 8. Counsel for HDC indicated that it would be willing to increase its bid to $6.3 million, subject, of course, to all Agreements. Oct. 13 Hrg. Tr. at 19–20. Counsel for Dick's stated that its purchase offer was subject to the REA, as it was recorded, and that the Bankruptcy Court should not make the sale subject to the JDA and the Memorandum of Understanding, as those two agreements were unrecorded. *Id.* at 10–11, 13–17.

The hearing on this issue ended with Phar–Mor's suggestion that it attempt to create an order incorporating the Bankruptcy Court's and the parties' views regarding the Agreements. Oct. 13 Hrg. Tr. at 22–26. Phar–Mor also noted that it would be interested in HDC's revised bid if the proposed draft order is unacceptable to Dick's. *Id.* at 22.

Phar–Mor, Dick's and HDC each submitted a separate proposed draft order as they were unable to agree on the wording of the proposed order. Dick's proposed order was subject to recorded documents, but silent as to unrecorded documents. Bankruptcy Court Order dated November 30, 1994 at 2, Bankruptcy Court Document # 5804 (hereinafter "Nov. 30 Order"). The proposed order submitted by HDC made the transaction subject to all Agreements, while Phar–Mor's proposed order was subject to recorded agreements and silent concerning unrecorded agreements.[2] *Id.* at 2–3.

The Bankruptcy Court determined to fashion its own order, finding that the Agreements, recorded or unrecorded, were property rights and must be made subject to the sale. Nov. 30 Order at 3. The Bankruptcy Court also found that Dick's proposed order was "final evidence of its unwillingness to purchase the property from Debtor on the terms authorized by the Court." *Id.* Because HDC agreed to meet Dick's $6.3 million offer

and to purchase the property subject to the Agreements, the Bankruptcy Court authorized Phar–Mor to sell the property to HDC. *Id.* at 3–4. The Bankruptcy Court also held that "[i]t appears that the proposed purchase by [HDC] is made in good faith." *Id.* at 4.

On December 2, 1994, Phar–Mor transferred the property to OLE, HDC's assignee. April 17 Order at 5. That same day OLE transferred a portion of the property to Kohl's, the parties recorded the conveyance documents, and the sale was completed. *Id.*

On December 12, 1994, almost two weeks after the Bankruptcy Court's November 30 Order authorizing the sale to HDC, Dick's moved the Bankruptcy Court for an amendment and a stay of the order. April 17 Order at 5; Bankruptcy Court Document # 5892. Dick's sought to amend the order by striking the Bankruptcy Court's finding that Dick's was opposed to an order making the sale subject to the Agreements, by striking the finding that HDC bought the property in good faith, and by adding a finding that the parties closed the sale in bad faith. April 17 Order at 5–6.

On December 13, 1994, the Bankruptcy Court denied the portion of Dick's motion seeking a stay of the order and an injunction against construction work on the property, finding that "[t]he proposed order would have the Court enjoin acts by entities over which the Court is not fully satisfied it has jurisdiction." Bankruptcy Court Order dated December 13, 1994 at 2, Bankruptcy Court Document # 5910. At a telephonic conference on December 19, 1994, the Bankruptcy Court denied Dick's request to strike the finding regarding Dick's unwillingness to purchase the property on the terms set out by the Bankruptcy Court, and to add a finding that the sale parties closed in bad faith. Bankruptcy Court Order dated December 22, 1994 at 2, Bankruptcy Court Document # 5989 (hereinafter "Dec. 22 Order"); April

---

2. The interpretation of Phar–Mor's proposed order appears to be a mistake. The proposed order filed by Phar–Mor appears to make the sale subject to the Agreements. *See* Debtor's Proposed Order at 4, Bankruptcy Court Document # 5719 ("It is therefore the view of this Court that the Debtors sell, and Dick's takes, the Real Property free and clear of liens, claims, encumbrances and interests to the extent more specifically set forth, but subject to the Development Agreements.") and at 8, 12.

17 Order at 6–7.[3] The Bankruptcy Court granted permission to conduct discovery and to submit further evidence and arguments on Dick's request to strike the finding that the acquisition was in good faith. Dec. 22 Order at 2–3; April 17 Order at 6. The Bankruptcy Court also ruled that only events occurring prior to its November 30 Order were relevant to the issue of good faith. Dec. 22 Order at 2–3; April 17 Order at 6.

Following discovery Dick's filed a supplemental pleading on the issue of good faith. In its submission, Bankruptcy Court Document # 6181, Dick's urged the Bankruptcy Court to make several findings of fact regarding the alleged good faith of the parties to the sale, the thrust of which allege that David Handel, HDC and the Developer engaged in conduct designed to prevent the sale of the property to Dick's.[4]

On April 17, 1995, the Bankruptcy Court issued an order denying Dick's motion to strike the finding that the purchase by HDC was made in good faith. April 17 Order at 10. The Bankruptcy Court first ruled that it would follow other courts and employ "the good faith analysis used * * * in situations involving [appeals of sale orders under] § 363(m)" in *determining* whether the sale to HDC should be set aside.[5] *Id.* at 7. In determining whether the conduct alleged by Dick's required the order to be set aside, the Bankruptcy Court followed a line of cases requiring fraud or collusion among the parties to the sale in order to set it aside. *Id.* at 8–9. The Bankruptcy Court declined to follow a line of analysis that *examines* events subsequent to the confirmation order when evaluating good faith, relying on "the fundamental principle of finality of a confirmed

---

**3.** The Bankruptcy Court memorialized its rulings made during the December 19, 1994 telephonic conference in its December 22, 1994 and April 17, 1995 orders. Its comments regarding Dick's purchase proposal is instructive:

> Dick's consistently represented that the most it would accept was an order which was silent as to the effect of the unrecorded documents. The fact that Dick's submitted its own proposed order of sale was a clear indication to the Court that Dick's did not consent to the terms contained in the Debtor's proposed order. If Dick's was in fact 'ready, willing and able to close' on an order which complied with the Court's stated view of the law, it never communicated that fact to the Court.

April 17 Order at 6.

**4.** The proposed factual findings are summarized as follows: (1) that David Handel led Dick's into believing that HDC would lease the property to Dick's if HDC purchased the property, and that after the auction, in which Dick's was the highest bidder, David Handel agreed to lease the space to Dick's if Dick's would "flip" HDC the property, all while David Handel had no intention of leasing the property to Dick's; (2) that after the auction, David Handel and Kohl's entered into an agreement whereby an assignee of HDC's would sell part of the property to Kohl's, which agreement was not subject to the Joint Development Agreement and called for an amendment to the Reciprocal Easement Agreement; (3) that David Handel, in a desire to prevent Dick's from purchasing the property, represented to the Bankruptcy Court that Dick's was not financially viable, and obtained two letters disparaging Dick's financial status, though neither were shown to the Bankruptcy Court; (4) that HDC and the Developer in bad faith misrepresented to

the Bankruptcy Court that the Agreements were essential to proper development of the property; (5) that David Handel, HDC and the Developer argued that the Joint Development Agreement precluded a sale to Dick's since it called for the construction of a prototypical Phar–Mor store, and that HDC was willing to purchase the property subject to the Joint Development Agreement and the Memorandum of Understanding because the only other party to the agreements, other than the Developer, was Phar–Mor, making amendment possible; (6) that Kohl's failed to apprise the Bankruptcy Court that its agreement with David Handel to purchase the property was inconsistent with the arguments made to the Bankruptcy Court by HDC and the Developer; (7) that after the October 13, 1994 hearing HDC and the Developer refused to communicate with Dick's regarding whether they objected to Dick's proposed development of the property, and that David Handel interfered with Dick's attempt to determine whether Homeowner's Warehouse, a signatory to the REA, objected to Dick's proposed development; (8) that HDC and the Developer misrepresented to the Bankruptcy Court that Phar–Mor's proposed order for sale of the property did not properly take into account the Agreements, and that David Handel, HDC and the Developer knew that the misrepresentations were material and misleading; and, (9) that the original purchase agreement between Phar–Mor and HDC was not subject to the JDA and did not reference the MOU. Bankruptcy Court Document # 6181 at 35–38.

**5.** The relevant portion of section 363(m) appears *infra*. In essence, it provides that a bankruptcy sale to a good faith purchaser cannot be disturbed on appeal in the absence of a stay of the sale order and sale.

sale," the requirement in § 363(m) that the challenger obtain a stay of the sale order before a good-faith purchaser's rights can be altered, and the "frequently-cited language" of *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195 (7th Cir.1978) that "refers to 'good faith status *at a judicial sale* ...'" April 17 Order at 9 (emphasis added by Bankruptcy Court) (quoting *In re Rock Indus.*, 572 F.2d at 1198).

Noting that the challenged "conduct must be extremely egregious to be deemed in bad faith," the Bankruptcy Court held that Dick's did not demonstrate bad faith:

> Upon review of the evidence and the record as a whole, the Court concludes there is no basis to strike the finding that HDC purchased the Property in good faith. The good faith in question is that of the buyer and seller in the sale transaction. Every instance of the alleged bad faith cited by Joseph Queri, Dick's witness, has to do with the alleged conduct of David Handel, HDC's principal, not Phar–Mor. Collateral negotiations between bidders or a purchaser and seller do not rise to the level of fraud or collusion necessary to rescind a sale.

April 17 Order at 10 (citations and footnote omitted). The Bankruptcy Court further concluded that "[t]he fact that [David] Handel and HDC may have entered into negotiations and/or agreements with Kohl's, to the exclusion of Dick's, prior to the sale has no bearing on the relationship between Phar–Mor and HDC." *Id.* at 10–11.

Dick's subsequently appealed the Bankruptcy Court's orders confirming the sale and denying Dick's motion to amend and stay the sale order. On appeal, Dick's argues that the Bankruptcy Court erred by (1) confirming the sale to HDC rather than to Dick's; (2) refusing to stay the sale order; and, (3) finding that the sale was made in good faith. Dick's raises several subsidiary issues within each main issue, but delineation of these subsidiary issues is unnecessary since, as discussed below, only the good faith issue is relevant to this appeal.

## STANDARD OF REVIEW

On appeal of a decision of the bankruptcy court, the district court is "not the trier[ ] of fact," but rather "is bound by the bankruptcy court's findings of fact unless they are clearly erroneous." *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993); *see also* Bankr.R. 8013. "[A] finding [of fact] is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (internal citations and quotations omitted). Moreover, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Bankr.R. 8013. Legal conclusions are reviewed *de novo*. *Batie*, 995 F.2d at 88.

## STANDING AND MOOTNESS

Appellees HDC and OLE moved to dismiss Dick's appeal, arguing that Dick's lacks standing as an unsuccessful bidder and that, in any event, Dick's appeal is moot since Dick's was similarly unsuccessful in its attempt to obtain a stay of the November 30, 1994 Order.

■ HDC and OLE correctly point out that unsuccessful bidders generally lack standing to appeal a confirmation order. *See In re Colony Hill Associates*, 111 F.3d 269, 273 (2d Cir.1997). The Bankruptcy Code does not expressly describe appellate standing, and courts confronted with the issue "have consistently applied a standard 'derived' from former section 39© of the Bankruptcy Act of 1898, which permitted only a 'person aggrieved' to appeal an order of the bankruptcy court.'" *Id.* (quoting *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 641–42 (2d Cir.1988)). A "person aggrieved" has been described as a person who is "directly and adversely affected pecuniarily" by the bankruptcy court's challenged order. *Kane*, 843 F.2d at 641 (internal quotation and citation omitted). "This standard 'reflect[s] the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly

affected by every bankruptcy court order.'" *In re Colony Hill,* 111 F.3d at 273 (quoting *Kane,* 843 F.2d at 642).

Courts have also applied the traditional "zone of interest" test to determine standing in the bankruptcy arena. That test examines "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (internal quotation and citation omitted). Because the provisions of the Bankruptcy Code regarding sales of property "are intended to protect the creditors of such estates and not prospective purchasers," unsuccessful bidders generally lack standing to challenge an order of sale under the zone of interests test. *In re HST Gathering Co.,* 125 B.R. 466, 468 (W.D.Tex.1991).

While unsuccessful bidders generally are not considered to be aggrieved persons or to be within the zone of interests of the Bankruptcy Code for purposes of standing, courts have recognized an exception in cases where the unsuccessful bidder challenges the underlying fairness of the sale.[6] The Second Circuit recently held that an unsuccessful bidder had standing to challenge a bankruptcy sale "to the extent [the unsuccessful bidder] alleges that [the purchaser's] actions destroyed the 'intrinsic fairness' of the sale transaction so that it was not a good faith purchaser." *In Re Colony Hill Assoc.,* 111 F.3d at 274. There, the unsuccessful bidder failed to comply with a bidding requirement and thus was not permitted to participate the bidding for the property. *Id.* at 272. The unsuccessful bidder argued, *inter alia,* that the sale order should be overturned because the purchaser engaged in collusive bidding and was not a good faith purchaser. *Id.* at 274. In holding that the unsuccessful bidder had standing with respect to the good faith issue, the Second Circuit relied on several cases, including *In re Harwald Co.,* 497 F.2d 443 (7th Cir.1974). *Id. Harwald,* a pre-Bankruptcy

Code case, succinctly explains the rationale underlying the standing exception:

> Courts * * * properly entertain suits challenging the equity of a bankruptcy sale transaction, on the assumption that sales tinged by fraud, mistake or unfairness would generally result in an accepted bid below that which might have been expected in a fair, free market situation. Thus, when an unsuccessful bidder attacks a bankruptcy sale on equitable grounds related to the intrinsic structure of the sale, he brings himself within the zone of interests which the Bankruptcy Act seeks to protect and to regulate.

497 F.2d at 444–45 (internal citations omitted).

■ The Court agrees with the holding of the Second Circuit in *Colony Hill* and the comments of the Seventh Circuit in *Harwald.* Dick's thus has standing to challenge the sale order, but only insofar as Dick's alleges that the sale was not made in good faith.

■ Similarly, Dick's appeal is not moot to the extent that it challenges the good faith status of the purchaser. Section 363(m) of the Bankruptcy Code, 11 U.S.C. § 363(m), effectively renders moot an appeal of a sale order to a good faith purchaser unless a stay of the order and sale has been obtained. That section provides in relevant part:

> The reversal or modification on appeal of an authorization * * * of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). "[T]he language of § 363(m) makes it imperative that a stay of an order authorizing the sale of property by a debtor be obtained by the party seeking a reversal on appeal of such an order." *In re Dial Industries, Inc.,* 137 B.R. 247, 250

---

**6.** *See In re Colony Hill Associates,* 111 F.3d at 274 (2d Cir.1997) (unsuccessful bidder had standing to challenge "'intrinsic fairness'" of sale and good faith status of purchaser); *In re Harwald Co.,* 497 F.2d 443, 444 (7th Cir.1974)

(noting that unsuccessful bidders may challenge sale "on equitable grounds related to the intrinsic structure of the sale"). The Sixth Circuit does not appear to have addressed the issue.

(Bankr.N.D.Ohio 1992). This provision "subserves the bankruptcy law policy of finality of judgment and enables third parties to rely on such orders and judgments of bankruptcy courts." *Id.* (internal citation omitted). By the very terms of section 363(m), however, an appeal is not moot even in the absence of a stay if the purchaser did not purchase the property in good faith.

As noted above, Dick's sought a stay of the November 30, 1994 Order and sale, but not until December 12, 1994. By that time, the sale had been consummated and development of the property had begun. Because Dick's was unsuccessful in obtaining a stay, all of the issues raised in this appeal are moot except for the issue of good faith, to which the Court now turns.[7] *See In re Colony Hill Associates,* 111 F.3d at 272.

### GOOD FAITH SALE

As discussed above, section 363(m) prohibits disturbing a sale on appeal that was not stayed if the buyer purchased the property in good faith. *See* 11 U.S.C. § 363(m). Because Dick's did not obtain a stay, Dick's must demonstrate that HDC purchased the property in bad faith in order to undo the sale.

Dick's raises three challenges to the Bankruptcy Court's decision on the good faith issue: First, Dick's argues that the Bankruptcy Court incorrectly ruled that the good faith of the purchaser is determined by events occurring up to and until the order confirming the sale, and not after; second, Dick's asserts that the Bankruptcy Court's factual findings on the good faith issue were legally insufficient under Federal Rule of Civil Procedure 52(a); and, third, Dick's argues that the Bankruptcy Court erred in

ruling that the purchase was made in good faith.

■ The Bankruptcy Court determined that only events occurring up until the time of the order confirming the sale are relevant to the issue of good faith. Dec. 22 Order at 2; April 17 Order at 9. Reviewing the Bankruptcy Court's ruling on this issue de novo, *see In re Batie,* 995 F.2d at 88, the Court agrees with the Bankruptcy Court's ruling. The language of section 363(m) is clear— both *the authorization and the sale* must be stayed in order to affect the rights of a good faith purchaser. *See* 11 U.S.C. § 363(m). Thus, section 363(m) presupposes that the facts demonstrating good or bad faith will be manifested by the time of the sale order. Moreover, the acts relevant to purchasing property pursuant to a judicial order necessarily would take place either before or at the time of the judicial authorization for the sale. *See In re Rock Indus.,* 572 F.2d at 1198 ("The requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings.").

The Bankruptcy Court correctly declined to follow *In re F.A. Potts and Co., Inc.,* 93 B.R. 62 (E.D.Pa.1988), *aff'd without opinion,* 891 F.2d 280 (3d Cir.1989), which evaluated events occurring subsequent to the confirmation order in determining whether the sale was made in good faith. As the Bankruptcy Court noted, "[t]he opinion contains minimal discussion of the basis for [its] conclusion," citing only its "permitted discretion" under Federal Rule of Civil Procedure 60(b). April 17 Order at 9. Accordingly, the decision is unpersuasive to the Court.

In arguing that acts subsequent to the confirmation order may be relevant to the

---

7. HDC and OLE also assert that this appeal is moot under the common law doctrine of mootness and under Bankruptcy Rule 7062. The Court disagrees. The common law doctrine of mootness has no place in the present analysis since section 363(m) speaks directly to the issue—it allows appeals in the absence of a stay when the purchase is not in good faith. Nor does Bankruptcy Rule 7062 create a mootness barrier to the present appeal. Rule 7062 establishes exceptions to Federal Rule of Civil Procedure 62(a), which prohibits executions and enforcements on judgments for 10 days following

entry of the judgment. One such exception to the 10-day automatic stay provision is a sale order pursuant to section 363(m). HDC and OLE argue that, given Rule 7062, Dick's should have anticipated that the parties would complete the sale quickly. Instead of acting quickly to stay the sale, they argue, Dick's waited far too long, rendering any appeal moot. This argument fails as it ignores the rather specific language of section 363(m), which, as discussed above, allows an appeal if the purchaser did not act in good faith.

issue of good faith, Dick's also relies on *In re Winstead*, 33 B.R. 408 (M.D.N.C.1983), and *In re Halladay Enterprises, Inc.*, 5 B.R. 83 (Bankr.S.D.Tex.1980). Neither decision, however, persuades the Court of Dick's position, for neither decision involves the issue of good faith. The district court in *In re Winstead* reversed a sale order because a proposed buyer did not receive adequate notice of the sale. The property was conveyed after the court approved the sale but before entry of the confirmation order and before a stay motion was filed. 33 B.R. at 410. The district court ruled that the property could be ordered returned to the trustee *notwithstanding section 363(m)*, not because the purchaser acted in bad faith, but because the trustee conveyed the property before the expiration of the 10–day period provided under former Bankruptcy Rule 802 in which to file a notice of appeal and before the expiration of the time in which to seek a stay. *Id.* at 410–11. Contrary to Dick's assertion, the court made no determination as to the good faith of the purchaser.

*Halladay* is uninstructive for the same reason. There the bankruptcy court set aside a sale order and sale, which was consummated on the date the sale order was issued, when two days after the sale order the purchaser filed for chapter 11 relief. The bankruptcy court reasoned that, "[t]o hold that a sale made within ten (10) days of the order approving sale is irreversible under any circumstances would deprive a party from attaining the status quo during an appeal or a motion under Rule 62 and, such a result, in my opinion, is clearly contrary to the intent of Rule 805 and Rule 62." 5 B.R. at 87. Like *Winstead*, the court made no finding regarding the purchaser's good faith.[8]

■ Next is the question whether the Bankruptcy Court's factual findings on the good faith issue were insufficient under Federal Rule of Civil Procedure 52.[9] Dick's labels the Bankruptcy Court's findings "naked" and "conclusory" and criticizes the Bankruptcy Court for failing to address Dick's "32 pages of proposed findings". Brief of Appellant at 26–27.

Rule 52 in relevant part provides that, "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon[.]" Fed.R.Civ.P. 52(a). As the Sixth Circuit has stated, this rule requires that the trial court "state its findings with sufficient specificity to indicate to the appellate courts the factual basis for its conclusions of law." *In re Allied Supermarkets, Inc.*, 951 F.2d 718, 726 (6th Cir. 1991) (internal citation omitted). "Rule 52(a) does not require an exhaustive determination of all the facts." *Id.* Moreover, findings without the "desirable clarity" may nevertheless satisfy the mandates of the rule. *See id.*

Dick's argues that the Bankruptcy Court erred because it failed to make "a single subsidiary finding on the good faith issue." Brief of Appellant at 26. Dick's also contends that the Bankruptcy Court could not have considered Dick's evidence of bad faith since Dick's relied on documents and testimony from both HDC and Kohl's, making it impossible for the Bankruptcy Court to then find that they acted in good faith.

The Court concludes that the Bankruptcy Court's findings satisfied Rule 52(a). The Bankruptcy Court noted that "[e]very instance of the alleged bad faith cited by Joseph Queri, Dick's witness, has to do with the alleged conduct of David Handel, HDC's principal, not Phar–Mor." April 17 Order at

---

**8.** To the extent the reasoning in *Winstead* and *Halladay* might suggest that the property could be ordered returned to the trustee in this case (because the property was conveyed before expiration of 10 days following the Bankruptcy Court's confirmation order), that reasoning is called into question by an amendment to Bankruptcy Rule 7062, which now includes an order under section 363(m) within a group of orders excepted from the 10–day automatic stay provisions of Federal Rule of Civil Procedure 62(a). Thus, HDC and Phar–Mor were entitled under that section to transfer the property before the

expiration of the ten-day period. Moreover, Dick's inexplicably waited twelve days before seeking a stay. As a participant in bankruptcy proceedings, Dick's should understand the necessity for filing motions to preserve the status quo as quickly as possible, given the importance of finality in the area of bankruptcy sales.

**9.** Rule 52 applies to the Bankruptcy Court through Bankruptcy Rule 7052. 11 U.S.C. § 7052.

10 (footnote omitted). It then focused on Dick's most serious allegation—the alleged secret negotiations among HDC, David Handel and Kohl's for the purchase of a portion of the property after Dick's was the highest bidder at the auction. The Bankruptcy Court concluded that

> [c]ollateral negotiations between bidders or a purchaser and seller do not rise to the level of fraud or collusion necessary to rescind a sale. *See In re Miami Gen. Hospital, Inc.,* 81 B.R. 682 (S.D.Fla.1988) (successful bidder did not engage in bad-faith conduct by offering to finance bid of another party, in effort to raise bid to level sufficient to pay off mortgage). The fact that Handel and HDC may have entered into negotiations and/or agreements with Kohl's, to the exclusion of Dick's, prior to the sale has no bearing on the relationship between Phar–Mor and HDC.

April 17 Order at 10–11.

The Bankruptcy Court's findings on the good faith issue were sufficient to apprise the Court of the factual basis for its conclusion. The Bankruptcy Court was not required to exhaustively consider every factual allegation presented by Dick's. *See In re Allied Supermarkets, Inc.,* 951 F.2d at 726. The Bankruptcy Court honed in on the thrust of Dick's claims and found that, even assuming David Handel and HDC negotiated with Kohl's and signed an agreement for the purchase of the property, they did not cross the line into bad faith. Contrary to Dick's assertions, the Bankruptcy Court did not have to disbelieve testimony and documents from HDC and Kohl's in order to find in their favor; the Bankruptcy Court simply disagreed with Dick's that their agreement to purchase the property lacked good faith. Its findings in this regard are legally sufficient.

■ Moving to the merits of the good faith issue, Dick's argues that the Bankruptcy Court erred in finding that the sale was made in good faith. On appeal Dick's narrows its focus regarding the conduct it believes constitutes bad faith. Dick's argues that HDC committed a fraud on the Bankruptcy Court by misrepresenting the importance of the Agreements and by entering into an agreement with Kohl's that did not include all Agreements and modified one agreement in important respects. Dick's also contends that Kohl's committed a fraud on the Bankruptcy Court by failing to disclose HDC's misrepresentations or its agreement with HDC.

The good faith requirement in section 363(m) is undefined. Some courts, however, "have 'turned to traditional equitable principles' and held that the 'phrase' encompasses one who purchases in 'good faith' and for 'value.' " *In re Colony Hill Assoc.,* 111 F.3d at 276 (quoting *Cumberland Farms Dairy, Inc.; National Farmers' Organization, Inc.,* 788 F.2d 143, 147 (3d Cir.1986)). "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Rock Indus.,* 572 F.2d at 1198.

The Bankruptcy Court's finding that the purchase was made in good faith is not clearly erroneous. HDC represented to the Court the importance of making the sale of the property subject to the Agreements, and HDC's offer to purchase the property was subject to the Agreements. *See* Bankruptcy Court Document # 5393 at 4–6; # 5535; # 5749 at Exhibit A (proposed amendment to purchase agreement made sale subject to Agreements). Dick's assert that just prior to the October 13 hearing on the proposed sale to Dick's, HDC entered into an agreement to sell the property to Kohl's which was not subject to all of the Agreements. But that assertion is contrary to the evidence. The agreement between HDC and Kohl's states that it is subject to

> a) the Use Restrictions required by Phar–Mor in the Purchase Agreement; b) Items number 1–3, 5–10 & 12 of Schedule B—Section II of the title exceptions set forth in the title report issued by First American Title Insurance Company; and c) *such other exceptions as may be reasonably approved by Kohl's* & ; d) Memorandum of Understanding dated March 9, 1992.

Deposition Exhibit 32 at 2 (emphasis added) [10]. Lawrence H. Evinger, director of Real Estate Development with Kohl's, negotiated with HDC on behalf of Kohl's for the purchase of a portion of the property. Deposition of Lawrence H. Evinger at 3, 5, 16–17 (hereinafter "Evinger Dep."). In his deposition on behalf of Kohl's he testified that Kohl's understood that it was "buying the property subject to the agreements that were affecting it." Evinger Dep. at 3, 23–24.[11] This documentary and testimonial evidence demonstrates that the agreement with Kohl's to purchase the property was subject to all Agreements, contrary to Dick's assertion.

Dick's argues that Kohl's committed a fraud on the Bankruptcy Court by failing to disclose its agreement with HDC and failing to point out that the agreement was inconsistent with HDC's representations to the court. This argument is meritless, for as just demonstrated, Kohl's believed its agreement with HDC to purchase the property was subject to the Agreements. It therefore had nothing to disclose to the Bankruptcy Court.

Dick's also asserts that, while the agreement between HDC and Kohl's was subject to the REA, the agreement amended the REA in important respects, such as the location of buildings on the property. In other words, Dick's argues that HDC misled the Bankruptcy Court by arguing that the Agreements were critical to the sale when it had just agreed with Kohl's to amend the REA. This argument ignores, however, the Bankruptcy Court's reasons for making the sale subject to the Agreements in the first place. It was concerned, rightfully, that the non-debtor third parties to the Agreements not lose the benefit of their bargain as a result of the section 363 bankruptcy sale. As the Bankruptcy Court stated during the October 13 hearing:

> * * * I have no intention in providing for the sale of this property to provide that the people who are developing the shops at Boardman Park not have the benefit of the original bargain of an orderly development of those properties[.]
>
> \*    \*    \*    \*    \*    \*
>
> I just think it inappropriate for bankruptcy courts of the United States to be interfering with the property rights of entities that are not debtors. And I take seriously the application of the take-in [sic]

---

**10.** The quoted language from the agreement with Kohl's appears in handwriting on the agreement. See Deposition Exhibit 32 at 2. Deposition Exhibit 14 contains a copy of this agreement, but the quoted language is written in different handwriting. See Deposition Exhibit 14. While there are some minor, mostly technical, differences in the quoted language in Deposition Exhibit 14, Dick's does not appear to dispute them. See Brief of Appellant at 10–1 (quoting Deposition Exhibit 32 and citing Deposition Exhibit 14, without noting any differences).

**11.** Mr. Evinger testified as follows:

Q: Did [David Handel] ever say to you that the sale would be subject to the reciprocal easement agreement?
A. Yes.
Q. Did he ever say to you that it would be subject to the memorandum of understanding?
A. Yes.
Q. Did he ever say to you that it would be subject to the joint development agreement?
A. Yes.
Q. He said it would be?
A. Yes.
Q. When did he say that?
A. I don't recall a specific time I could refer you to, but we were buying the property subject to the agreements that were affecting it.
Q. Did you ever put that in writing?

A. Isn't this in writing here? [Referring to Deposition Exhibit 32].
Q. This only refers to the memorandum of understanding.

\*    \*    \*    \*    \*    \*

A. The question was where in Dick's Exhibit 32 it says that the joint development agreement applies?
A. It doesn't.
Q. Was that ever put in writing?
A. I don't remember that it was.

\*    \*    \*    \*    \*    \*

Q. Did [David Handel] ever assure you that if necessary, you could modify—it would be possible to modify those agreements to go forward with what Kohl's planned to do with the property?
A. No.
Q. [By Mr. Evinger's attorney] The answer is no?
A. Well, after we bought the property, I think there was some kind of a modification to their reciprocal easement agreement that he may have mentioned. I don't remember specifically. Evinger Deposition at 23, 24, 26–27.

clause of the Fifth Amendment. That courts of the United States do not have the right to interfere with non-debtor's property rights except, specifically, as authorized by Congress. And it is my view—no, it is my unalterable view—that with respect to this transaction, Congress has provided no avenue for me to say to the debtors in transferring this property to the highest bidder, you can reject those agreements which appear to have been the benefit of the bargain of the various parties debtor and non-debtors in the development of the premises.

Oct. 13 Hrg. Tr. at 5, 9; *see also* Nov. 30 Order at 3 (concluding that the Agreements are property rights and "that a § 363 sale process does not constitute the due process of law which would authorize the taking of property rights of entities that are not parties to this cause"). In short, the Bankruptcy Court wanted to avoid having the buyer obtain the benefits of the Agreements without the attendant burdens. That did not happen here. HDC and Kohl's are bound by the Agreements as a whole. Moreover, HDC and Kohl's agreed to *seek approval of the proposed amendments* to the REA; any decision on the proposed amendments was to be made by all parties to the REA, not simply by HDC and Kohl's. *See* Deposition Exhibits 14, 32. Thus, the rights of the third parties could not have been affected by the agreement between HDC and Kohl's without their consent.

Dick's erroneously likens this case to *In re Tri–Cran, Inc.*, 98 B.R. 609 (Bankr.D.Mass. 1989), in which the bankruptcy court vacated a sale because the purchaser colluded with a stockholder of the debtor, the stockholder's brother and law partner (who was also a personal friend of the purchaser), and the attorney for the debtor, in an effort to obtain the debtor's property at the lowest possible price, and because the purchaser concealed from and misrepresented to the bankruptcy court his relationship with the parties and the less than arms-length dealings with the debtor. 98 B.R. at 619–22.

Unlike the parties in *Tri–Cran,* the parties here disclosed all relevant facts to the Bankruptcy Court. HDC disclosed the nature of the Agreements and urged the Bankruptcy Court to make any sale of the property subject to the Agreements. There was no need to inform the Bankruptcy Court of the agreement between HDC and Kohl's, as the agreement, consistent with HDC's representations, made the sale of the property subject to the Agreements. Moreover, the agreement with Kohl's did not stifle the bidding or have the effect of decreasing the purchase price, so there was no need to inform the Bankruptcy Court generally of the agreement. *See In re Miami Gen. Hospital, Inc.*, 81 B.R. 682, 686–89 (S.D.Fla.1988) (no bad faith when purchaser negotiated with other bidder in attempt to raise bidding price).

■ Dick's attempts to avoid the impact of its failure to stay the sale order and sale, as required by section 363(m) in order to affect the rights of a good faith purchaser, by arguing that section 363(m) is inapplicable because Phar–Mor did not move to have the court approve the sale of the property to HDC based on HDC's revised offer, as required by the Bankruptcy Code. The Bankruptcy Court correctly rejected this argument, reasoning that

[w]hat Dick's fails to realize is that Debtor's motion to sell to HDC was never ruled upon, but merely held in abeyance pending renewed bidding. Debtor did not file a new motion to sell to Dick's, but to amend the motion to sell to HDC. What the November 30, 1994 order did, in effect, was overrule the motion to amend and sustain the motion to sell, as orally amended at hearing to reflect a price of $6.3 million.

April 17 Order at 11. As Dick's admits, Phar–Mor *amended* its motion to sell the property, rather than file a new motion when it sought approval to sell the property to Dick's. *See* Brief of Appellant at 3 ("On October 7, Phar–Mor filed a Notice of Continued Hearing on the sale of the property stating that it was amending its Motion to sell the property to seek approval of an attached contract to sell to Dick's for $6,300,-000, the highest bid received at the auction.") and 22. At the October 13 hearing, HDC indicated that it would increase its bid to $6.3 million and Phar–Mor indicated that it would be interested in HDC's orally revised bid if

Dick's for some reason did not purchase the property. Oct. 13 Hrg. Tr. at 22; *see also* Submission of Debtor's Proposed Order at Exhibit B, p. 10, Bankruptcy Court Document # 5719 (draft order of sale submitted to court, allowing Phar–Mor to sell to HDC at price of $6.3 million if sale to Dick's does not go through). Thus, Phar–Mor did indicate its desire to amend the motion to sell the property based on HDC's revised bid if the property was not sold to Dick's. The Bankruptcy Court denied the motion to sell to Dick's, which left unresolved the amended motion to sell to HDC based on HDC's revised bid. The Bankruptcy Court properly granted the amended motion and approved the sale of the property to HDC.

### CONCLUSION

For the foregoing reasons, the Bankruptcy Court did not err in ordering the sale to HDC, denying Dick's motion to amend the sale order, and refusing to stay the sale order and sale.

Accordingly, the orders of the Bankruptcy Court are hereby **AFFIRMED** and the Motion to Dismiss is hereby **DENIED**.

IT IS SO ORDERED.